Durr-Irving v. Colvin, 13-3275. Good morning. Good morning. May it please the Court, my name is David Kornfeld, appearing on behalf of the appellant Linda Durr-Irving. As my time is short and since you have thoroughly reviewed the briefs, my emphasis will be to stress a few major positions, all of which point to the unreasonableness of the ALJ's decision and the fact that substantial evidence does not support the ALJ's residual functional capacity assessment, the adverse credibility finding, and ultimately the Step 5 denial because at the root of the decision is the ALJ infamously taking on the role of doctor and failing to give adequate consideration to the medical opinion of treating physician Dr. Ezia Coley and specifically to the impairment of urinary incontinence. With respect to the RFC, the ALJ's decision failed to accord any additional off-task time or any functional limitation at all to Ms. Irving's severe urinary incontinence, which was related to the diagnosis of pelvic organ prolapse. Now those words will not appear in the ALJ's decision. The medical records document that the condition worsened from a previously assessed milder form to a degree in 2010 assessed by Ms. Irving's attending gynecologist to be at stage 2, warranting possible surgical intervention. The medical records document frequent involuntary incontinence with the need to change protective depends diapers multiple times throughout the day. The records reflect that Ms. Irving repeatedly reported that she was going to the bathroom every 30 minutes during the day and that at night she was reported going to the bathroom 5 to 10 times, causing her to have sleep problems. She testified at the hearing that she was going to the bathroom every 30 minutes during the day and that when going out, despite wearing depends diapers, she would still wet up her clothing. Now all these symptoms that she's having is while she's at home. Ms. Irving asserts it was unreasonable for the ALJ to conclude that her urinary incontinence would not cause more than minimal functional limitations and that it was unreasonable for the ALJ to interpret the medical evidence on her own as not presenting any new objective evidence of further functional limitations when the objective evidence actually showed worsening pelvic organ prolapse from the previously assessed stage 1 to stage 2. Now a stage 1 prolapse means the vaginal wall bulges down to within 3 centimeters inside the opening of the vagina, whereas a stage 2 prolapse means that the vaginal wall comes to or slightly through the opening. Other objective evidence included the gynecologist noting a second degree cystocele, which occurs when the bladder protrudes into the front wall of the vagina, and a second degree rectocele, which is a type of prolapse where part of the rectum bulges into the back wall of the vagina. And finally the gynecologist did an empty supine stress test, which was noted to be positive, reflecting urine leakage. Thus the ALJ was simply wrong when she asserted that the evidence did not include objective evidence and it was unreasonable for the ALJ to fail to even minimally discuss the pelvic organ prolapse and the conversations that Ms. Irving had with her doctor about the strategies for dealing with the prolapse and incontinence. Finally then, it was unreasonable for the ALJ not to consider the impairment to be severe and to not accord any additional off-test time to the impairment. And the reason why this is crucial and important is that if this Court agrees with the appellant that some additional off-test time should have been attributed to the impairment, when adding that time to the 10% off-test time attributed to both fatigue and depression related to Ms. Irving's other impairments in the ALJ's RFC... Would you label any of those other impairments as severe? What the ALJ did is label the impairments as severe, the asthma as severe, and also the shoulder history. So this analysis went beyond step two, but the pelvic organ prolapse was not considered a severe impairment and no functional limitation at all was added to the RFC. The 10% off-test time was exclusively attributed to the fatigue and depression. We have a sort of a cumulative thing here. Yes. Did you actually argue that? Well, the vocation... It's curious, this obviously is always emphasized throughout here about how bad that condition is. And I understand she's married, isn't that correct? Yes, Judge. And so obviously the husband is sharing in this difficulty, I suppose. Yes. So that's why I'm curious when you add them all up, it becomes... I know you've isolated this one as the one that was really considered. Yes. The vocational expert testified that anything beyond 10% of the workday off-test, an individual would not be capable of performing the jobs that were identified. And so with this incontinence, it would put her well beyond that 10% given that... And it would be our position then that the step five burden, which the commissioner has the burden at that point, would not in any reasonable world be considered as being met. And a favorable decision actually can be accorded and directed. It should be noted that the VE testified that only one hourly five-minute break would be allowed by an employer. And here the evidence documents the need to go to the bathroom every 30 minutes. And that allotment was five minutes each time she went, right? Yes. So that's 10 minutes every half hour, so that's 20 minutes every hour. That's correct. The ALJ's RFC did not account for any off-test time beyond that which the judge accorded to the fatigue and the depression. The commissioner has advanced an incorrect position that the RFC accommodated regular bathroom breaks on top of the 10% off-test time. It's true that the RFC contemplates normal breaks. That would be a lunch break and generally one morning and one afternoon break. That is what is contemplated by the term normal. Hourly bathroom breaks are not normal. And although the VE testified that might be permissible by an employer, the VE did not testify that hourly bathroom breaks on top of the 10% off-test time attributed to her other impairments would be permissible. The aggregate off-test time would, in combination, amount to about 20% of the workday, well beyond what the VE indicated would be the upper limit. In any event, as noted, Ms. Irving testified, and the record supports the fact that she was going to the bathroom every 30 minutes and would require more than one hourly bathroom break, also beyond what the VE indicated would be permissible. You're in your rebuttal time. With respect to Dr. Eziakouli's opinion rendered in November of 2010, it's just our position that the ALJ, the Commissioner's position, that the ALJ rightly disregarded the opinion of Dr. Eziakouli as being contrary to the objective evidence in the longitudinal record, including his own notes, is simply not borne out when actually looking at the longitudinal record. And finally, I just want to speak to the ALJ's credibility finding. There's no way to trace the ALJ's reasoning with respect to why Ms. Irving's testimony was not accepted with respect to the urinary incontinence symptoms. As in the case of Murphy v. Astrew decided by this court, the ALJ's credibility finding was intertwined with the same gaps in the record and reasoning that require reversal with respect to the ALJ's failure analyzing the medical evidence. The ALJ here witnessed for herself Ms. Irving suddenly needing to leave the hearing room to go to the bathroom, yet there was no mention of this in the decision. All there really is with the credibility finding is boilerplate, that Ms. Irving's impairments caused the symptoms that she alleged, but the intensity, persistence, and limiting effects of the symptoms were deemed not credible, to the extent not consistent with the RFC. Given the lack of any discussion regarding whether she believed the urinary incontinence testimony, there was no logical bridge as to why, if it was rejected, why it was rejected. We urge this court to find that substantial evidence does not support the ALJ's credibility determination for the reasons we've stated. If there are no further questions, I shall reserve the remainder of our time for rebuttal. We stand on the briefs. As to all other issues, we urge this court to reverse the ALJ's decision and at a minimum remand the matter back to the Commissioner for further proceedings. Thank you. Ms. Freeberg. May it please the Court, Counsel Cynthia Freeberg, on behalf of Carolyn Colvin, Acting Commissioner of Social Security. Regarding Dura Irving's urinary incontinence problems, the ALJ discussed it in her decision, and she reasonably found it to be a non- Well, we know one job she shouldn't take, and that's a Court of Appeals judgment. Go ahead. She reasonably found it to be a non-severe impairment because it did not Be a career impairment here. Dura Irving's past work included being a machine operator and machine feeder, and the jobs that the ALJ concluded that she could do were office helper, mail clerk, and cashier. And that she could do all those things by taking a bathroom break every half hour? No. That she could do those jobs given the residual functional capacity for a range of light work, which included 10% off-task time in addition to normal breaks. Ten percent of an eight-hour day works out to be 48 minutes, if my math is correct, and I think it is. And it's in addition to normal breaks, which is two 15-minute breaks and a half-hour lunch. So by my calculations, that comes out to about six minutes an hour, but again, this is in addition to normal breaks. Well, the ALJ did not- Yeah, so six minutes an hour, but she wouldn't be able to take a full 15-minute break in the morning or in the afternoon because she has to go every half hour. She'd have to find a place of employment, which is right next to the ladies' washroom. Well, she does get her 15-minute breaks. Right, but what I'm saying is that doesn't help her. If she needs every half hour, you usually get a 15-minute break in the morning and a 15-minute break in the afternoon. So she would have to take all those minutes of the break, add them in the morning so that she could go eight times in the morning and go eight times in the afternoon. Due to Irving's contention that she needs to have a bathroom break every half hour, her testimony in that regard is completely unsupported. That's her subjective testimony. I don't know how you'd support that except to do it. You say you have to do it, you do it. Even in grammar school, you had to raise your hand, but nobody ever told you to sit down and you don't have to do it because I know you don't have to do it. Well, in order to be found disabled, a claimant needs to prove. You know, there's degrees of being disabled. I don't suggest that somebody that's incontinent is disabled from other offenses in life. But if you can tell me a job where you've got to get up every 30 minutes, unless your job is a washroom attendant, you're a dead pigeon. That's what you should have tried for, a washroom attendant. But, you know, maybe your experience has been different from mine, but then I'm an old man. Well, again, it's our position that a claimant has to show with evidence, including medical evidence, that she has an impairment that causes her function. She introduced sufficient medical evidence. The other thing always has to be a subjective discussion of what I have to do. There you go. And the ALJ discussed her urinary problems and found them to be non-severe. Yes. And the commissioner submits that if the court finds... You didn't sit next to her at any time during these proceedings, did you? I mean... No, I did not. I guess you would. If this court finds that the ALJ did commit error, we contend that any error in this regard is harmless because... But that can't be because it really goes to the central question whether or not there's anything she can actually do, you know, with this issue of having to go to the bathroom every half hour. And her doctor said that the condition was worsening. You agree with that? Well, she was diagnosed with the Stage 2. I don't know... But initially wasn't it Stage 1? Yes. Yeah, so it had gone from 1 to 2, so it was getting worse, right? Because when you go up, it doesn't mean it's getting milder, it means it's getting worse. So there was some evidence to corroborate her. And our position is that that does not necessarily corroborate her claim that she needs to go to the restroom every 30 minutes. We also note that this was a longstanding impairment and that Dara Irving worked with this impairment in the past. Yeah, right, when she was Stage 1, right? That's when she was working, she was Stage 1. I mean, did the government put on evidence saying that going to Stage 2 means you're getting better or that this thing was going to resolve? I mean, I understand that she could work when the condition wasn't very serious, but it's now getting way more serious. Well, again, even based on her other statements that she had made, she reported changing her depends undergarments three times a day. So there's no, she hasn't offered any persuasive reason why she could not be doing this during her normal break times or her. But here, let's just take that statement. You said she changed the depends three times a day. So then we assume then that she was able to go to the bathroom every half hour. And even, we assume she was able to get to a bathroom. So here she is, she's not working, she's going every half hour, and she's having to change that way. So that means even going every half hour, she's having accidents, right? Because you don't change the depends unless you've had an accident, like you can't get to the bathroom fast enough, right? That's why you change the depend. Because you don't just change the depends just to change them. You change them because they're soiled and you need new ones. And she was at home and going presumably every half hour or hoping to get to the bathroom every half hour, and she was having accidents three times a day. I don't believe that Der Irving has established that she was going three times a day and that she was changing. I'm sorry, I apologize. You said that she said she changed the depends three times. She changed the depends. And a transcript site for that is transcript page 571. Our position is that Der Irving has not established with medical evidence that she needed to go to the bathroom every 30 minutes and also change depends three times a day. We believe that any frequency problems she had would be reasonably accommodated by the 10% off task time. Council stated that the ALJ observed Der Irving leave for a restroom break during the hearing. That's correct. However, we note that the hearing was at one hour and 18 minutes long. At transcript page 61, it indicates the hearing started at 339. Transcript page 119 indicates the hearing ended at 457. So that's consistent. If it's 118 minutes, she went once. No, one hour and 18 minutes. One hour and 18, right. And she went once. So one hour would be every half hour. So here it was 39 minutes. She did leave the room towards the end of the hearing when the vocational expert was testifying, and that is at transcript page 114. The ALJ notes that she had asked to be excused, and then she returns transcript page 115. In the ALJ notes, she's been gone, I think, what, two minutes maybe? So she was able to take a two-minute bathroom break. So I assume the bathroom was relatively close. I'm not familiar with the hearing room. If it's two minutes, it wasn't very far. She actually went, right? If she's gone two minutes, it had to be right next door. Counsel brought up the point that she had to be excused from the hearing. She was in the restroom. I'm pointing out that she took one two-minute bathroom break towards the end of a one-hour, 18-minute hearing. Right, and what I'm saying is the bathroom had to be relatively close if she was gone for two minutes. You would agree with that. Common sense tells you that. Well, I don't know that. I'm not familiar with the hearing room. I notice I'm out of time. Regarding Dr. Zicchioli's opinion and the ALJ's credibility finding, we submit that they were supported by substantial evidence, and we will rest on our briefs. All right, thank you. Thank you. How much time does he have? You have one minute. Just a couple points. Considering the last piece of argument, one minute should get you to a lot of discussion. With respect to the Commissioner's argument. Two minutes, you could do a lot of other things besides argue. That 30 minutes was not mentioned, only at the hearing. It was mentioned repeatedly in the gynecology records from 2010 when Ms. Irving was seeing a series of resident physicians prior to seeing the attending gynecologist. Did the doctors testify? So it's in their records that she was reporting this. Yes. And also that the condition was getting worse. That's from the records, right? That is true. And to the extent that the Commissioner is arguing that the 10% accommodated the impairment, that would be questionable in violation of Chenery, trying to rewrite the ALJ's decision, which this court has repeatedly criticized the Commissioner about, most recently in the case of Hanson. We'll stand on the briefs with respect to all our records. All right, we'll take the case under advisement. This is the last case of the day, so the court will stand in recess.